**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **PAUL NGAI AND XIAOYAN NGAI,**<br>           **Plaintiff,** | **CIVIL ACTION** |
| **v.** | |
| **URBAN OUTFITTERS, INC., LORIE A.**<br>**KERNECKEL, BARBARA ROZSAS,**<br>**JOHN DOES 1 THROUGH 10 AND ABC**<br>**CORPORATIONS 1-10,**<br>           **Defendants.** | **NO.  19-1480** |

## <u>MEMORANDUM OPINION</u>

Defendants Urban Outfitters, Inc. ("Urban"), Lorie A. Kerneckel, and Barbara Rozsas

(collectively, Defendants) move for summary judgment on Paul Ngai ("Plaintiff" or "Ngai") and

Xiaoyan Ngai's (together, "Plaintiffs") claims for national origin and age discrimination,

retaliation, and hostile work environment in violation of Title VII of the Civil Rights Act of 1964

(Title VII), the Age Discrimination in Employment Act (ADEA), the Pennsylvania Human

Rights Act (PHRA), and the Philadelphia Fair Practices Ordinance (PFPO), aiding and abetting

discrimination in violation of the PHRA and PFPO, whistleblower retaliation in violation of the

Sarbanes-Oxley Act, violation of the Pennsylvania Wage Payment and Collection Law (WPCL),

and common law intentional infliction of emotional distress (IIED) and loss of consortium.[1]  In

turn, Plaintiffs move for partial summary judgment with respect to Defendants' affirmative

defense that Ngai failed to mitigate damages.  For the reasons that follow, Defendants' motion

will be granted in part and denied in part and Plaintiffs' motion will be denied.

---

[1] Plaintiff abandons his gender-based claims of discrimination, retaliation, and hostile work environment,
common law wrongful discharge, and whistleblower retaliation under the Dodd-Frank Wall Street
Reform and Consumer Protection Act in his summary judgment briefing.  These claims will therefore be
dismissed.

## I.   BACKGROUND

From the evidence of record, the pertinent facts are as follows.  Paul Ngai was born in China on August 9, 1949.  He has lived in the United States for about forty-four years and is a U.S. citizen.  After completing his education in China, he moved to the United States in 1976 and attended the Fashion Institute of Technology in New York City for two years beginning in 1978.  He spent the next 40 plus years working in the fashion and garment industry in the United States.  During that time, he developed an expertise in the areas of sourcing and costing apparel and the apparel manufacturing process.

### A.  Plaintiff's Hire and Initial Employment with Urban

On or about June 5, 2010, Plaintiff accepted a position with Urban Outfitters, Inc. as a Director of Sourcing and Technical Design.  Urban offers life-style oriented clothing and general merchandise through a portfolio of global consumer brands, including Anthropologie, Urban Outfitters, BHLDN, and Free People.  Plaintiff was hired on an at-will basis by Barbara Rozsas, who at all relevant times was Urban's Chief Sourcing Officer.  Plaintiff also reported to Lorie Kerneckel, Urban's Executive Director of Sourcing, from 2015 onward.[2]  Plaintiff was sixty years old at the time he was hired.  Per his offer letter, Plaintiff's starting salary was $250,000, and he was eligible for an escalating bonus based on whether the company met designated financial metrics.  The offer letter further provided that "[t]he company bonus plan is completely discretionary, and may change from year to year."

As a Director of Sourcing and Technical Design, Plaintiff was principally responsible for reviewing apparel designs, calculating the yardage and cost of fabric necessary for individual

---

[2] The parties dispute whether Plaintiff reported directly to Kerneckel, who in turn reported to Rozsas (according to Defendants), or to both women (according to Plaintiff).  The distinction is not relevant for purposes of these motions.

units, and interfacing with internal design teams at Urban and factories in China and elsewhere to execute and manufacture the designs.  He was also responsible for ensuring that the overseas factories properly executed the designs while minimizing production expenses.  This required him to ensure that the factories were limiting waste and were competitively pricing material, labor, and other costs.  He also helped train other Urban employees on cost engineering and related sourcing matters.

Plaintiff received positive feedback for his technical expertise in cost engineering and his negotiation efforts with Urban's manufacturers and vendors, including from Kerneckel and Rozsas.  For instance, Kerneckel once told Plaintiff, "I have every confidence in your negotiation power and will leave it to you to handle the strategy."  Other members of the sourcing team also supported Plaintiff when he negotiated better prices with vendors.  On the other hand, Plaintiff also received constructive criticism in his annual performance reviews, in particular regarding his cross-functional communication with other teams.  Furthermore, in one noteworthy incident in 2015, Plaintiff was disciplined following a factory visit in Vietnam.  A representative from Coddy, an Urban vendor, relayed to Rozsas that Plaintiff yelled at a female Coddy employee in front of several people.  Rozsas called this behavior "appalling" and "inexcusable," and required Plaintiff to apologize or risk losing his job.  As a result, Plaintiff sent an apology message.

In September 2016, Kerneckel and Rozsas approached Plaintiff about transitioning into a Cost Engineer subject matter expert ("SME") position.  This was a lateral transition whereby Plaintiff would maintain his status as a Director with the same pay and bonus structure.  Plaintiff did not oppose this change in roles.  In his new Cost Engineer SME role, Plaintiff was responsible for identifying and implementing cost reduction strategies for the Free People product.  It also required him to collaborate with Brand/Category directors to provide guidance

on pricing and engineer print layouts to control costs.  He served as an SME resource whom members of the Free People product team could call upon to assist with various sourcing and costing issues.  His transition to this role was announced on May 15, 2017.

### B.  Plaintiff's Working Environment[3]

Plaintiff alleges that he became the subject of routine ethnic and age-based attacks from early on in his employment at Urban.  Most of the staff with whom Plaintiff worked were females under the age of thirty.  He would hear remarks, directly and reported to him by others, including that he was "too old" to understand the brand, that he should be "retired," not to travel because it was too much for him, that his "broken English" made no sense, and that he didn't understand "American culture" or the hip Urban brand because he was foreign.  He was routinely referred to by colleagues as the "old man" or "Mr. Miyagi," as pop-culture reference to an older, Japanese movie character.

Plaintiff alleges that his supervisors were well-aware of this harassment, but they did nothing to curb it.  Instead, Plaintiff's supervisors, including Kerneckel and Rozsas, made similar remarks such as "old Chinese guys are good at sourcing" and that, among other things, the younger employees should learn something from him "while he's still around."  According to Plaintiff, he complained directly to his supervisors, but because Urban did not have a Human Resources Department, he had no place to turn after his supervisors failed to protect him. Plaintiff found one incident particularly offensive.  In or about July 2017, someone posted a poster of stereotypical Asian cartoon picture with the words: "For he a jowwy good fellow… Happy Retirement."  The poster was found in a secured area of the Urban offices and, therefore, was clearly posted by an Urban employee.  Another Asian colleague that worked on the same

---

[3] Defendants contest all the allegations in this section and the next.

floor as Plaintiff, Ryan Nguyen, brought the poster to Plaintiff's attention.  Since Plaintiff was the only older Asian employee and because Plaintiff had been subjected to years of racial and age-based taunts, Plaintiff understood immediately that someone had posted it referring to him. This was extremely upsetting, so much so that Plaintiff could not even talk about it and needed to leave the office to clear his head and calm down.  Nguyen brought the poster to Rozsas, who laughingly said it looks like Plaintiff but failed to discipline anyone regarding the incident.

### C.  Plaintiff's Reports About Vendor and Manufacturer Misconduct

Meanwhile, Plaintiff also alleges that—as a part of his job responsibilities and pursuant to Urban's Code of Conduct—he began reporting improper conduct by certain of the vendors and manufacturers with which Urban worked.  Specifically, Plaintiff discovered that certain agents and suppliers were engaging in tactics to purposefully inflate production costs, that there were significant conflicts of interest in these supply chains in violation of Urbans' policies, and that certain suppliers were reportedly paying kickbacks to Urban executives to secure additional, high-volume orders.  He reported this conduct to Rozsas, Kerneckel, and others.  Nevertheless, Plaintiff was merely scolded and told to mind his own business.

### D. Plaintiff's Reduction in Hours and Salary in January 2018

On January 23, 2018, Rozsas informed Plaintiff that his hours were being reduced to thirty-two hours per week (or 3–4 days a week), at a salary reflective of the reduced workload. His hours were reduced by 20% and his salary by about 32%, to a base salary of $210,000 with commensurate reduction in his salary-based bonus.  Plaintiff retained the same number of vacation days as a fulltime employee and his title as a Cost Engineer SME.  Plaintiff informed Rozsas and Kerneckel that he would enjoy "work[ing] with the team and all the challenge to make it better and more efficien[t]."

The parties agree that the justification offered at the time of the reduction in hours and salary was Urban's budget.  Defendants claim that the there was a decrease in the overall volume of work for the sourcing department.  According to Urban's 2018 Form 10-K, gross profits fell from 2017 to 2018 by almost 6%.  Before the reduction decision, Plaintiff informed Kerneckel that he often did not have enough work to do.  In July of 2017, Plaintiff also wrote to his co-worker and friend Ryan Nguyen commenting that the retail and manufacturing industries were slowing down, predicting more and more store and companies would be closing, and expressing his relief that he would be getting out of this business within the next three years.  Likewise, on December 19, 2017, Plaintiff informed Kerneckel and another Urban executive that he was not being asked to provide his expertise on costing issues to Free People personnel.[4]  The reduction in hours and salary became effective April 1, 2018.

### E.   Plaintiff's Termination in September 2018

Because the parties' accounts differ significantly with respect to the circumstances of Plaintiff's termination, each version is provided separately.  Needless to say, the parties largely dispute or deny the other account.

#### 1.  *Plaintiff's Version of Events*

Plaintiff alleges that, following the reduction in hours and pay, which he viewed as a discriminatory and retaliatory demotion, he complained, and then complained again and again, about his treatment at Urban.  Following his perceived demotion, Plaintiff complained to Kerneckel that Urban was promoting younger, female employees whom he had trained, while at the same time reducing his hours and cutting his salary.  When Kerneckel failed to respond,

---

[4] The parties disagree over the cause of Plaintiff's work deficit.  Plaintiff describes workflow issues that were no fault of his own, whereas Defendants claim that various members of the Free People design team did not want to work with Plaintiff.  As discussed *infra*, resolving this dispute is not relevant to the summary judgment motion.

Plaintiff then complained to Rozsas.  Rozsas, though apparently sympathetic, suggested that there was little she could do and asked "wasn't [he] getting too old for this crap[?]"  Rozsas also made plain that Plaintiff was "never going to be a brand director," which Plaintiff interpreted was because he did not fit the mold of a young, white, female.  Instead, Rozsas suggested that Plaintiff simply ride out his "last few years" so he could retire back to China with his family and not have to deal with the day-to-day of office politics.  She further suggested that Plaintiff would be happier if he retired because he was getting "too old" for living out of a suitcase and taking long flights to China and India to meet with suppliers.

Urban also began systematically excluding Plaintiff from meetings and other events that were a routine and necessary part of his job.  For example, for the first time in 2018 Plaintiff was not invited to a week-long event where Urban vendors from around the world came to meet with the sourcing professionals.  He only learned that these meetings were taking place when one of his supplier contacts reached out to him to find out when he was retiring, as he had heard through the grapevine that it would be soon.  Plaintiff believes he was purposely excluded by Rozsas, Kerneckel, and other senior executives.

Plaintiff again complained to Rozsas, who said she would "look into it" but denied having been a party to any such rumors.  When Plaintiff followed up with Rozsas, she indicated that she "forgot" because she was busy with other things and "did not have time for this," referring to investigating Plaintiff's complaints.  Plaintiff made numerous complaints to Rozsas and Kerneckel to no avail.  Ultimately, he was told if he was not happy, he should just retire.  Rozsas and Kerneckel both told Plaintiff on various occasions that he should seriously consider retiring because he was at that point in his life and career.

In or about April 2018, Plaintiff engaged counsel.  Between April and his termination in

September 2018, Plaintiff's counsel sent about twenty letters advising Urban that Plaintiff was the subject of ongoing age and national origin discrimination and retaliation. These letters also detailed corporate waste and mismanagement issues among Urban's vendors and manufacturers that Plaintiff had uncovered during his employment. By way of example, Plaintiff alleged that Coddy International Hong Kong, Inc. and Coddy International Taiwan, Inc. (the same Coddy involved in the complaint against Plaintiff) was, *inter alia*, charging an "agent/fabric financial fee" well above the industry standard, overestimating the amount of fabric needed, inflating shrinkage projections, purposefully laying out designs in ways that would increase waste, and self-dealing by referring Urban to factories controlled or owned, in whole or in part, by family members of Coddy's owners. Plaintiff identified similar and other issues with respect to other suppliers and agents including, among others, Feltonville Holdings and My Dyer.

Rather than take corrective measures or investigate his claims, Urban terminated Plaintiff. On September 4, 2018, when Plaintiff arrived for work, Rozsas and Kerneckel gave Plaintiff a proposed separation agreement and told him to go home to consider it. When questioned, Rozsas assured Plaintiff he was not being terminated, but refused to allow him in the office and told him he was required to go home and "think about" the separation agreement.

When Plaintiff tried to return to work the next day, he was forcibly removed from the premises under threat of arrest. When the police were called, Kerneckel advised them that Plaintiff was not allowed on the premises and that he was now being terminated. Kerneckel provided Plaintiff a termination notice dated September 5, 2018 advising, in part, that Plaintiff was being terminated for his "failure to make sustained improvement in the performance objectives provided . . . in the FY18 performance appraisal process," "continued inability to get along with cross-functional partners," and on the basis that the "SME role for print and cost

engineering . . . is being eliminated."

### 2. Defendant's Version of Events

For their part, Defendants argue that Plaintiff's performance steadily, then rapidly, declined in the months and weeks before his termination and label his counsel's letters as a not-so-subtle attempt to extort a generous severance package on his way out the door.  His fiscal year 2018 performance review—which covered his performance in 2017—reflected that he lacked "buy in" from colleagues and encouraged him to "develop relationships with peers to achieve best results."  Kerneckel also noted that he needed to be more "proactive."  This feedback was consistent with how Plaintiff reported that he was not getting enough work and that the design team was not coming to him for his help.  While Plaintiff highlights the positive feedback he received—including "[h]e has proven to be a true subject matter expert and the team values his input"—he acknowledges that his rating was downgraded in this evaluation.  This review was sent to Plaintiff via email in March.

The following month, on April 16, 2018, Urban received the first letter from Plaintiff's attorney alleging unlawful discrimination due to Plaintiff's age and national origin, as well as complaints about Urban's management of vendors.  Defendants do not contest the receipt or substance of any of the subsequent approximately twenty letters from Plaintiff's counsel.  Specifically, Defendants agree that the letters complained of discrimination against Plaintiff, factories and vendors inflating costs, overcharging Urban, and holding conflicts of interest, as well as Plaintiff being retaliated against and frozen out for complaining.  The April 16th letter is the first documented complaint of discrimination or vendor misconduct in the record, although Plaintiff alleges that he made previous verbal complaints.

 Shortly after the first letter, on April 19th and again on the 27th, Plaintiff emailed Rozsas

claiming he was being retaliated against for his complaints.  Specifically, Plaintiff said that he

had no work to do, and was concerned he was being "freezed out" in retaliation for his

complaints.  Rozsas responded assuring Plaintiff that his complaints were being handled by legal

and that no one was denying him work or freezing him out.  Moreover, Rozsas clarified that, as

had always been the expectation for his role, "[a]nyone at your level should be self-directed in

their work and be engaging directly with the Brand Directors to calendarize meetings and to

execute their initiatives" independently.

According to Defendants, this time was characterized not only by a wave of letters from

Plaintiff's counsel, but a sharp decline in Plaintiff's job performance and a litany of complaints

about his workplace conduct.  As Defendants see it, Plaintiff began shirking his job

responsibilities, disrupting business operations, and disrespecting his colleagues.  For example,

on May 30, 2018, Kerneckel was informed by Melissa Bashir, Senior Brand Director of Sourcing

for Anthropologie, that Plaintiff jeopardized the delivery of a dress order because he insisted that

a vendor utilize an "unrealistic" yardage estimate, which required Urban to send someone to the

factory to personally confirm that Plaintiff's estimate was wrong.  On one occasion in June,

Marjorie Schepp, Director of Product Development for Free People, reported to Kerneckel that

Plaintiff's cost targets were incorrect and higher than those offered by the factory at issue.  On

another occasion that month, Schepp reported that Plaintiff had been engineering prints using

non-standard dimensions, which caused a factory to throw out work, start over on the print, and

delayed production.

On June 19, 2018, Schepp again emailed Kerneckel to report that:

> I have been getting a lot of feedback from my teams that Paul is not engaging in
> these [print engineering] meetings.  He is also showing up 15–35 minutes late.  The
> team has to find him in the building and a couple times he has been outside eating
> lunch while a meeting is scheduled.  I know that the teams can benefit from these

meetings [however] I do not think that they should need to track him down to make
sure he attends. Also, a big part of the print engineering meeting is that Paul draws
out a mini marker for tech to upload into TS. We had a situation yesterday where
it came up that this is no longer happening. . . . I am surprised by this because this
was a crucial part of the process that Paul laid out.

Plaintiff's performance issues culminated in meeting on August 23, 2018, after which

several employees reported that Plaintiff was disrespectful to a female colleague. A Product

Development Manager for Free People emailed Schepp as follows:

I wanted to let you know about today's print meeting with Paul. He was very
disrespectful to the print team (Emma). He was cutting her off and telling her she
doesn't know what she was talking about when she was merely trying to suggest
an option. He proceeded to get more frustrated with her and would not let her talk.
It was very unprofessional and I felt very uncomfortable after the meeting when he
was at my desk complaining about her. I just wanted to bring this to your attention.

That same day, another employee on the design team, Becky Dator, also emailed Schepp that the

female employee at issue "just came back from [an] Engineered Print meeting and is so upset

that she wont even talk about it. I've talked to Paul in the past about maintaining professionalism

(he's made other people cry before)." These reports were made to or shared with Kerneckel,

who shared the feedback with Plaintiff the same day.

Consistent with these reports, the following anonymous complaint was filed through

Urban's reporting hotline the day after the August 23rd meeting:

I am writing to report an incident that happened with Paul Ngai. I wouldn't be
reporting this except that it is not the first time it's happened, and I don't think it's
ok for him to call people names and tell people they don't know what they are
talking about when they are very qualified. When Paul talks to women he assumes
that they are not as smart as men, as his attitude changes significantly when a man
is brought to a meeting instead. I also don't think it's ok for him to raise his voice,
single people out, make them feel bad, and make them cry after meetings. During
a cross functional meeting this week Paul raised his voice and repeatedly told
another employee "you don't know what talking about" when she was trying to
offer suggestions and problem solve. He then proceeded to cut her off and not let
her finish getting out her suggestions, repeating that she didn't know what she was
talking about. This employee was embarrassed after being called out and ridiculed
in this meeting with a lot of partners.

11

On September 4, 2018, in light of Plaintiff's failure to address the issues noted in his last performance evaluation, his unprofessional and disrespectful conduct, and the most recent complaints against him arising from the August 23rd design meeting brought by multiple individuals, Kerneckel decided (with Rozsas's approval) that Urban would end his employment and offer him a severance package.  Plaintiff was informed of this decision, given a copy of the severance agreement, and asked to remain at home while he considered the agreement.

The next day, September 5, 2018, Plaintiff reported to work despite Defendants' request that he not come to the office.  When asked to leave, he refused.  Defendants therefore called security to remove him from the premises.  He received the termination letter that same day, the contents of which the parties agree on as described *supra*.

### F.  Revelations During Discovery

During the course of discovery in this matter a series of emails between Plaintiff and his aforementioned colleague, Ryan Nguyen, came to light.  In sum, the emails reflect a series of sexually explicit and degrading conversations about women and, in particular, Urban campaign models.  Among other things, the men joke about bringing Urban's models to their homes or on business trips for sexual purposes, describe sexual scenarios and fantasies, and discuss having extramarital affairs.  Moreover, Defendants discovered that Plaintiff ordered several pornographic DVD's using his Urban email account.  Plaintiff claims that this order was inadvertently sent from his work email rather than personal email.

Defendants claim that these emails would have provided ample grounds to terminate Plaintiff pursuant to its Professionalism and Respect policy, had he remained employed until this discovery.  In relevant part, Urban's Employee Handbook includes a "Professionalism and Respect" policy providing that "[u]nder certain circumstances, the following conduct may rise to

the level of unlawful harassment or discrimination:" "[s]exually suggestive or explicit jokes,"

"[u]sing degrading words to describe a person," sending "[i]ndecent letters [or] emails," and

making "[r]emarks regarding a person's sexual preferences or orientation." The policy further

states that "[c]onduct prohibited by these policies is unacceptable in the workplace." As for

enforcement, the policy provides that misconduct "will be dealt with promptly and

appropriately" and lists a range of enforcement options from training to counseling to reprimand

to suspension to termination. Plaintiff describes the emails as jokes and sarcasm exchanged

privately between two consenting adults, neither of whom were offended or felt harassed by the

content. As such, by Plaintiff's estimation, they were not grounds for termination.

## II.    STANDARD OF REVIEW

"[S]ummary judgment is appropriate where there is no genuine issue as to any material

fact and the moving party is entitled to a judgment as a matter of law." *Alabama v. North*

*Carolina*, 560 U.S. 330, 344 (2010) (internal quotations marks and citations omitted). "[T]he

mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise

properly supported motion for summary judgment; the requirement is that there be

no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48

(1986). A factual dispute is material, and therefore must be resolved by the jury, only where it

"might affect the outcome of the suit under the governing law. . . ." *Id.* at 248. "A genuine issue

is present when a reasonable trier of fact, viewing all of the record evidence, could rationally find

in favor of the non-moving party in light of his burden of proof." *Doe v. Abington Friends Sch.*,

480 F.3d 252, 256 (3d Cir. 2007).

In ruling on a summary judgment motion, a court must "view the facts and draw

reasonable inferences in the light most favorable to the party opposing the summary judgment

motion." *Scott v. Harris*, 550 U.S. 372, 378 (2007) (internal quotations marks and alterations omitted).  However, "unsupported assertions, conclusory allegations, or mere suspicions" are insufficient to create an issue of fact and defeat summary judgment.  *Schaar v. Lehigh Valley Health Servs., Inc.*, 732 F. Supp.2d 490, 493 (E.D. Pa. 2010) (citing *Williams v. Borough of W. Chester*, 891 F.2d 458, 460 (3d Cir. 1989)).  A plaintiff cannot avert summary judgment with speculation or by resting on the allegations in his pleadings, but rather must present competent evidence from which a jury could reasonably find in his favor.  *Anderson*, 477 U.S. at 248. Finally, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions" and are not to be resolved by the court at summary judgment.  *Id.* at 255.

## III.   DEFENDANTS' SUMMARY JUDGMENT MOTION

### A.  Title VII, ADEA, PHRA, and PFPO Claims

Plaintiff brings claims for age and national origin discrimination, retaliation, and hostile work environment under Title VII, ADEA, the PHRA, and the PFPO.[5]  Because such claims are analyzed under similar legal frameworks, they will be considered together as appropriate.  *See, e.g., Fogleman v. Mercy Hosp., Inc.*, 283 F.3d 561, 567 (3d Cir. 2002) (precedent interpreting Title VII, ADEA, and/or PHRA is equally relevant to interpretation of each statute); *Jones v. Sch. Dist. of Philadelphia*, 198 F.3d 403, 409 (3d Cir. 1999) ("We do not distinguish between the claims under federal and Pennsylvania law in our disposition of the case as . . . the standards are

---

[5] Plaintiff properly exhausted his administrative remedies by filing his charge of discrimination with the EEOC and requesting that it be dual-filed with the PHRC.  While he made his initial filing at the EEOC office in Newark, New Jersey, the complaint was promptly transferred to the Philadelphia District Office, which has a workshare agreement with the PHRC.  *See Evans v. Gordon Food Servs.*, 2015 WL 4566817, at *3 (M.D. Pa. July 29, 2015) (explaining that under the work-sharing agreement between the EEOC and PHRC, "a claimant who files a charge of discrimination with one agency and instructs that agency to dual file with the other generally satisfies the requirements of both agencies.").

the same for purposes of determining the summary judgment motion"); *Joseph v. Cont'l Airlines, Inc.*, 126 F. Supp.2d 373, 376 n.3 (E.D. Pa. 2000) (same for PFPO).

## 1. Discrimination Claims

Title VII prohibits employers from discriminating against employees on the basis of, *inter alia*, national origin.  42 U.S.C. § 2000e(a)(1).  Similarly, ADEA provides, in relevant part, that "[i]t shall be unlawful for an employer . . . to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age."  29 U.S.C. § 623(a)(1).  Because Plaintiff must prove discrimination using circumstantial evidence, the burden-shifting framework established by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) applies to his discrimination claims.[6]  *See also Willis v. UPMC Children's Hosp. of Pittsburgh*, 808 F.3d 638,

---

[6] Under Title VII, a plaintiff generally may prove discrimination either by direct evidence, to which the "mixed-motive" framework applies, or circumstantial evidence supporting an inference of discrimination, to which the *McDonnell Douglas* burden-shifting framework applies.  *See Mardell v. Harleysville Life Ins. Co.*, 31 F.3d 1221, 1225-26 n.6 (3d Cir. 1994), *rev'd on other grounds*, 514 U.S. 1034 (1995).  Here, Plaintiff is not entitled to proceed under the direct evidence or "mixed motive" framework, as elaborated by the Supreme Court in *Price Waterhouse v. Hopkins*, 490 U.S. 228, 258 (1989).  First, this framework is not applicable to ADEA claims.  *See Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 170 (2009).  Furthermore, Plaintiff has not met the "high hurdle" of producing direct evidence of national origin discrimination in the decision-making process.  *Walden v. Georgia–Pacific Corp.*, 126 F.3d 506, 513 (3d Cir.1997) ("[A] plaintiff must clear a high hurdle to qualify for a mixed motives instruction").  The bulk of Plaintiff's national origin-based allegations involve his supervisors' failure to combat the culture of racism or reprimand other unnamed employees for their discriminatory comments about Plaintiff's Chinese ethnicity.  The racially biased statements directly attributable to Rozsas and Kerneckel—for example that "old Chinese guys are good at sourcing," or commenting that a racist cartoon looked like the Plaintiff—were not made in the context of employment decisions regarding the Plaintiff.  *See Ezold v. Wolf, Block, Schorr & Solis-Cohen*, 983 F.2d 509, 545 (3d Cir. 1992) ("Stray remarks by non-decisionmakers or by decisionmakers unrelated to the decision process are rarely given great weight, particularly if they were made temporally remote from the date of decision"); *see also Hook v. Ernst & Young*, 28 F.3d 366, 375 (3d Cir. 1994) (declining to apply the mixed-motive framework to decisionmaker's sexist statements where "there is no evidence they were related to the decision process. They were temporally remote and they had nothing to do with [plaintiff's] job performance.").  Plaintiff therefore has not produced evidence "sufficient to allow the jury to find that the decision makers placed substantial negative reliance on [the plaintiff's national origin] in reaching their decision to fire him." *Fakete v. Aetna, Inc.*, 308 F.3d 335, 338 (3d Cir. 2002) (internal quotation marks and citations omitted).

644 (3d Cir. 2015) ("Age discrimination claims in which the plaintiff relies on circumstantial evidence proceed according to the three-part burden-shifting framework set forth in [*McDonnell Douglas*]").

Under the first step of this framework, the employee bears the initial burden of establishing a *prima facie* case of discrimination by a preponderance of the evidence.  *See Burton v. Teleflex Inc.*, 707 F.3d 417, 426 (3d Cir. 2013).  Second, if the employee makes out a *prima facie* case, "the burden of production [then] shifts to the defendant to offer a legitimate non-discriminatory [reason] for the adverse employment action."  *Id.* (internal quotation marks and citation omitted).  "This burden is 'relatively light,' and the employer need only 'introduc[e] evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision.'"  *Tomasso v. Boeing Co.*, 445 F.3d 702, 706 (3d Cir. 2006) (alteration in original) (quoting *Fuentes v. Perskie*, 32 F.3d 759, 773 (3d Cir. 1994)).  In the third and final step of the *McDonnell Douglas* analysis, if the employer offers legitimate, non-discriminatory reasons for its actions, "the burden of production [shifts] back to the plaintiff to provide evidence from which a factfinder could reasonably infer that the employer's proffered justification is merely a pretext for discrimination."  *Burton*, 707 F.3d at 426.

Because the pretext analysis is where the rubber meets the road in this case, it requires further elaboration.  Plaintiff must make a showing of pretext to defeat an employer's motion for summary judgment.  *Id.* at 426-27.  To do so, "the plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action."  *Fuentes*, 32 F.3d

at 764.  In other words, a plaintiff "may defeat a motion for summary judgment by *either* [1] discrediting the proffered reasons, either circumstantially or directly, or [2] adducing evidence, whether circumstantial or direct, that discrimination was more likely than not a motivating or determinative cause of the adverse employment action." *Id.*   In seeking to discredit the employer's proffered reasons, "the plaintiff cannot simply show that the employer's decision was wrong or mistaken," but rather must show that the reason was a pretext for invidious discrimination. *Id.* at 765.  This burden is carried by "demonstrat[ing] such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder *could* rationally find them unworthy of credence." *Id.* (internal quotation marks and citation omitted).

Defendants do not dispute that Plaintiff has established a *prima facie* case for discrimination, but rather contend they are entitled to summary judgment because Urban has articulated legitimate, non-discriminatory reasons for Plaintiff's reduced hours and pay and later termination, and that Plaintiff has not produced sufficient evidence to show that these reasons were pretextual.

### i.    *Hours and Pay Reduction*

Turning first to Plaintiff's reduction in hours and pay in January 2018.  Because Defendants conceded that Plaintiff has a *prima facie* case, the burden of production immediately shifts to Urban to articulate legitimate, non-discriminatory reasons for Plaintiff's reduction in pay and hours.  Defendants meet this "relatively light" burden.  *See Fuentes*, 32 F.3d at 773. They contend that Plaintiff's hours and pay were reduced because of a decrease in the volume of work within the sourcing department.  According to Urban's 2018 Form 10-K, the company's gross profits were down from the previous year.  After transitioning to the Cost Engineer SME

17

role in May 2017, Plaintiff noted that the retail and manufacturing industries were slowing down, and informed Kerneckel and others that he often did not have enough work to do.  Therefore, according to Defendants, Rozsas cut Plaintiff's hours by 20% to thirty-two hours per week and reduced his salary by 32%, while allowing him to keep the same number of vacation days he had as a full-time employee.  These business-related reasons, taken as true, would permit the conclusion that Plaintiff's reduction in pay and hours was non-discriminatory.

Defendants having articulated legitimate, non-discriminatory reasons for its actions, the burden now shifts to Plaintiff to demonstrate that those reasons were a pretext for discrimination. He has not.  Plaintiff agrees that the proffered reason, at the time of his reduction in hours and pay, was budget related.  Yet, he does not point to evidence discrediting that reason or otherwise showing it was a mere pretext for discrimination.  The record—including Urban's 2018 Form 10-K and statements from Plaintiff referring to a retail slowdown and requesting work—supports Defendants' non-discriminatory justification for the decision to reduce Plaintiff's hours and pay. Plaintiff suggests that the proffered reason was pretextual because it differs from Defendants' litigation position, namely that Plaintiff was unoccupied because other members of the design team did not want to work with him.  Nevertheless, this additional reason for the decision is not inconsistent, nor is it discriminatory.  The undisputed bottom line is that Plaintiff regularly did not have enough work.  Whether Plaintiff lacked work because of a decline in business at Urban or because his colleagues were not interested in working with him, a reduction in his pay and hours would be non-discriminatory.[7]

---

[7] Even if Defendants' were wrong or mistaken in their assessments of Plaintiff's communication skills, teamwork, and professionalism, such perceptions and criticisms are non-discriminatory.  *See Fuentes*, 32 F.3 at 765 ("[T]he plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent.").

ii.     Termination

Plaintiff also claims that his termination in September 2018 was the result of improper national origin and age discrimination.  Defendants meet their burden of demonstrating legitimate, non-discriminatory grounds for Plaintiff's termination.  Defendants point to Plaintiff's declining job performance and workplace misconduct, as supported by emails to his supervisors from multiple Urban employees between May and August 2018 indicating Plaintiff was shirking his job responsibilities, disrupting business operations, and acting unprofessionally. According to Defendants, the performance issues culminated with the fateful August 23, 2018 meeting, where Plaintiff was disrespectful towards a female colleague.  According to Defendants, they decided to end Plaintiff's employment in light of his last performance review, his unprofessional and disrespectful conduct, and the multiple complaints arising from the August 23rd meeting.

Once again, the dispute over Plaintiff's termination turns on the pretext analysis, and Plaintiff bears the burden of demonstrating Defendants' decision to terminate him for performance issues and misconduct "was either a *post hoc* fabrication or otherwise did not actually motivate the employment action (that is, the proffered reason is a pretext)."  *Fuentes*, 32 F.3d at 764.  On the one hand, Plaintiff has not pointed to evidence discrediting the Defendants' account of the weeks leading up to his termination.  *See Kautz v. Met-Pro Corp.*, 412 F.3d 463, 467 (3d Cir. 2005) (instructing that to show pretext the employee must "present evidence contradicting the core facts put forward by the employer as a legitimate reason for its decision"). Concerns about Plaintiff's inferior work product, costly errors, behavior towards other employees, and lack of professionalism are corroborated by record evidence.  These issues were raised by multiple Urban employees, none of whom are not alleged to have fostered

discriminatory animus towards Plaintiff.  Plaintiff characterizes the work product issues as technical disagreements, rather than threats to Urban's business operation, and offers explanations for his behavior during the August 23, 2018 meeting.  Plaintiff's attempts to poke holes in those complaints or to show his termination "was wrong or mistaken" given his sourcing expertise fall short of demonstrating pretext.  *Fuentes*, 32 F.3d at 765.  It remains undisputed that no less than four Urban employees lodged complaints with Plaintiff's supervisors between May and August of 2018, just prior to his termination in September.  As the Third Circuit explained in *Fuentes*, "the issue is not whether the staff members' criticisms of [plaintiff] were substantiated or valid," but rather whether "the relevant decisionmaker . . . believed those criticisms to be accurate and actually relied upon them. . . ."  *Fuentes*, 32 F.3d at 766-67.  Defendants' reliance on these reports in deciding to terminate Plaintiff, whether or not they accurately reflected Plaintiff's conduct, is non-discriminatory.[8]

Nevertheless, Plaintiff may also overcome summary judgment by adducing evidence from which a reasonable factfinder could believe Kerneckel and Rozsas were motivated by national origin and/or age bias in deciding to terminate him in September 2018.  According to Plaintiff, he was the victim of regular anti-Chinese and age-based taunts and slurs.  Here it becomes necessary to parse Plaintiff's national origin and age discrimination claims.

With respect to his claims of national origin discrimination, while no doubt disturbing,

---

[8] Plaintiff's effort to discredit Defendants' proffered reasons for his termination by highlighting the positive portions of his 2018 performance evaluation (which covered 2017) likewise fails.  *See Robinson v. Matthews Int'l Corp.*, 368 F. App'x 301, 304 (3d Cir. 2010) (explaining that, in a dispute over an employee's performance reviews, the employee's "own view of his performance is irrelevant; instead, what matters is the perception of the employer.").  A balanced annual review, containing both positive and critical feedback, does not give rise to an inference of discrimination or suggest pretext.  Moreover, that Defendants offered some positive feedback regarding Plaintiff's 2017 performance is inapposite in evaluating his conduct during the summer of 2018.  It is not implausible or inconsistent to terminate an employee who, while previously successful, declines in performance or engages in serious misconduct.

most of Plaintiff's allegations involve unnamed colleagues and occurred at unspecified times.

The most specific incident, involving the racist cartoon poster suggesting Plaintiff was retiring,

occurred more than a year before his termination.  Moreover, Plaintiff does not allege that

Rozsas created the offending poster or that Kerneckel was made aware of the incident.

Likewise, the declarations Plaintiff offers in support of his allegations of anti-Chinese bias come

from co-workers who left Urban in 2017, and therefore had no personal knowledge of the events

leading up to or the reasons for his termination.  *See Kelly v. Univ. of Pa. Health Sys*., 2016 WL

4149991, at *8 (E.D. Pa. Aug. 2, 2016), *aff'd*, 708 F. App'x 60 (3d Cir. 2017) (finding that an

affidavit from a co-worker who did "not have first-hand knowledge of" the circumstances

surrounding plaintiff's termination "does not move the needle" at summary judgment).  Given

the contemporaneously documented performance issues in the immediate lead up to his

termination, the temporally remote and unrelated evidence of national origin discrimination is

insufficient for a reasonable jury to find Kerneckel and Rozsas were motivated by national origin

bias in deciding to terminate him.

On the other hand, Plaintiff alleges that both Kerneckel and Rozsas, after his demotion in

January 2018 and before his termination in September of that year, made explicit references to

his age and, on multiple occasions, suggested that he should retire.  Specifically, Plaintiff alleges

that Rozsas asked him, "wasn't he getting too old for this crap," suggested he "ride out his last

few years" before retirement,[9] and said claimed he would be happier if he retired because he was

_____

[9] Plaintiff alleges that Rozsas' comment, in full, was that he should ride out his last few years so he could
retire back to China with his family.  Plaintiff, whose family lives in the United States, suggests that this
also exhibits national origin bias.  Rozsas's incorrect assumption that Plaintiff's family resided in China
or that he would return to China upon retirement, while thoughtless and misguided, is not connected by
Plaintiff to the decision to terminate him, neither does he indicate how temporally close the statement was
made to his date of termination.

getting too old for living out of a suitcase and traveling to meet with suppliers.  He further alleges that both Rozsas and Kerneckel on various occasions told him he should seriously consider retiring because he was at that point in his life and career.[10]  Defendants vehemently dispute that any such comments were made and challenge the weight that should be given to allegations in Plaintiff's self-serving affidavit, where not otherwise supported by the record.  However, it is the cornerstone of summary judgment that "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge" ruling on a motion for summary judgment.  *Anderson*, 477 U.S. at 255.  On par, the comments about Plaintiff's age and repeated suggestions that it was time for him to retire, allegedly made directly by the decision-makers and in the months leading up to his termination, could lead a reasonable juror to infer that Defendants were more likely than not motivated by age bias in terminating him.

In sum, Plaintiff may proceed to a jury with respect to his claim that his termination was motivated by age in violation of ADEA, the PHRA, and PFPO.  Defendants are entitled to summary judgment with respect to his national origin discrimination claims and the ADEA claim related to his reduction in hours and pay.

### 2.    Retaliation Claims

Plaintiff also claims, pursuant to the same employment discrimination laws, that his reduction in pay and hours and later termination were in retaliation for his complaints about national origin and age discrimination at Urban.  Title VII prohibits an employer from retaliating against an employee "because he opposed any practice made unlawful by this section . . . or

---

[10] Defendants, beyond disputing that Rozsas and Kereckel ever made such statements, respond by suggesting that Plaintiff was indeed planning to retire in the next few years and had shared this plan with his family, therapist, and others at Urban.  So be it.  Plaintiff's plans to voluntarily retire do not give Defendants license to discriminate against him based on his age.

because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. 2000e-3(a); *see also* 29 U.S.C. § 623(d) (materially identical provision in ADEA). The employee bears the initial burden of stating a *prima facie* case of retaliation by establishing that: (1) he engaged in a protected activity; (2) the employer took a materially adverse action against him; and, (3) there was a causal connection between the protected activity and the employer's action. *Moore v. City of Philadelphia*, 461 F.3d 331, 340-41 (3d Cir. 2006). If the plaintiff makes out a *prima facie* case, then the *McDonnell Douglas* burden-shifting framework kicks in. *Id.* at 342.

Unlike the discrimination claims, Defendants challenge Plaintiff's *prima facie* case for retaliation. Specifically, they argue that Plaintiff has not shown: 1) that he made any complaints of national origin or age discrimination to his supervisors prior to his reduction in hours and pay; and, 2) that his complaints regarding discrimination were not the cause of his termination. In the alternative, Defendants argue that Plaintiff has not shown that their legitimate, non-discriminatory reasons for firing him were pretextual.

### 1.   *Reduction in Hours and Pay*

Plaintiff has failed to produce evidence from which a reasonable jury could conclude he engaged in protected activity prior to his reduction in hours and pay. Plaintiff's hour reduction and pay cut occurred in January 2018. However, Plaintiff describes a series of escalating complaints to his supervisors only *after* his demotion. Similarly, Plaintiff's attorney first wrote to Urban regarding national origin and age discrimination in April 2018. There is no record evidence to support Plaintiff's conclusory allegations that he reported on-going discrimination to his employer, including either Kerneckel or Rozsas, prior to his reduction in hours and pay. Plaintiff's declaration generically refers to complaints about his mistreatment prior to his

reduction in hours and pay, but does not explain when, to whom, or in what format any complaint was made.  *See Blair v. Scott Specialty Gases*, 283 F.3d 595, 608 (3d Cir. 2002) ("An affidavit that is essentially conclusory and lacking in specific facts is inadequate" to satisfy the standard for summary judgment) (internal quotation marks and citation omitted).  None of the thousands of emails exchanged in discovery, nor any record produced by Urban relating to Plaintiff's employment, refers to complaints made by Plaintiff regarding national origin or age discrimination prior to his reduction in hours and pay.  In fact, in April of 2017, Plaintiff wrote to Nguyen urging him not to leave the company and stating "[t]his is the best of best job at the east coast plus also the best of west coast."

While Plaintiff makes much of the temporal proximity between the incident with the racist cartoon poster in July 2017 and his demotion in January 2018, he does not argue that he reported or complained about the poster his supervisors.  To the contrary, he concedes that it was Nguyen who brought the poster to Rozsas' attention.  Plaintiff, on the other hand, was so upset by the poster that he "could not even talk about it" and had to leave the office to calm down. Plaintiff does not suggest that he had any later discussions about the racist poster with either Rozsas or Kerneckel.  Consequently, no reasonable juror could find that Plaintiff's reduction in hours and pay were retaliation for his complaining about the racist poster when there is no allegation he lodged such a complaint.

Because Plaintiff fails to identify evidence from which a reasonable juror could conclude that Plaintiff complained of or reported national origin or age discrimination prior to his reduction in hours and pay, he cannot succeed on a retaliation claim with respect to that decision.

### 2.  *Termination*

Defendants also oppose Plaintiff's claim regarding his termination, arguing that Plaintiff

has failed to establish a causal link between his complaints and his termination and, even if he

has, he cannot demonstrate that the proffered reasons for his termination are pretextual.  There is

no dispute that Plaintiff engaged in protected activity by complaining about what he believed

was unlawful age and national origin discrimination.  Rather, the parties disagree about the

causal link between those complaints and Plaintiff's termination.

       As an initial matter, Defendants incorrectly contend that Plaintiff must show that

retaliation was the "but for" cause of his termination to defeat the summary judgment motion.

*See Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 352 (2013) ("Title VII retaliation

claims require proof that the desire to retaliate was the but-for cause of the challenged

employment action."); *Gross*, 557 U.S. at 177 ("[T]he plaintiff retains the burden of persuasion

to establish that age was the "but-for" cause of the employer's adverse action").  While Plaintiff

will be subject to this heightened burden at trial, the Third Circuit has also held, in the wake of

*Nassar*, that "a plaintiff alleging retaliation has a lesser causal burden at the prima facie stage."

*Carvalho-Grevious v. Del. State Univ.*, 851 F.3d 249, 259 (3d Cir. 2017).  Thus, at the summary

judgment stage, "the plaintiff must produce evidence sufficient to raise the inference that her

protected activity was the *likely reason* for the adverse [employment] action."  *Id.* (internal

quotation marks and citation omitted).

       The Third Circuit has taken a flexible approach to causation, explaining that "a plaintiff

may rely upon a broad array of evidence" to establish a causal link between the protected activity

and the adverse employment action.  *Farrell v. Planters Lifesavers Co.,* 206 F.3d 271, 283-84

(3d Cir. 2000).  Indeed, the Court has advised against taking "too restrictive a view of the type of

evidence that can be considered probative of the causal link."  *Id.* at 281.  "The element of

causation, which necessarily involves an inquiry into the motives of an employer, is highly

context-specific." *Kachmar v. SunGard Data Sys., Inc.,* 109 F.3d 173, 178 (3d Cir. 1997).  The ultimate question is whether plaintiff's "proffered evidence, looked at as a whole, may suffice to raise the inference" of causation.  *Id.* at 177.  As guidance, the plaintiff may point to an unusually suggestive temporal proximity between the complaint and the adverse employment action, a pattern of antagonism after a complaint, an employer's inconsistent explanation for taking an adverse employment action, or "other evidence gleaned from the record as a whole from which causation can be inferred."  *Farrell,* 206 F.3d at 281-82; *see also Carvalho-Grevious*, 851 F.3d at 260.

There is sufficient evidence in the record as a whole for a reasonable juror to find a causal link between Plaintiff's complaints about discrimination and his termination shortly thereafter.  According to the Plaintiff, he began complaining to Kerneckel and Rozsas about his treatment at Urban following his reduction in hours and salary.  Kerneckel and Rozsas responded to his complaints, in short, by suggesting that Plaintiff was too old for this job, would never become a brand director, and should just retire.  While Defendants dispute these interactions, it is undisputed that Plaintiff's counsel sent a series of letters alleging, *inter alia*, that Plaintiff was subject to discriminatory treatment based on his age and national origin between April and September 2018.  He was terminated in early September 2018, the day after his final letter from counsel.  While the temporal proximity alone may not be "unusually suggestive" in light of the well-documented complaints about Plaintiff's workplace conduct, it is only one piece of the "broad array of evidence" on which Plaintiff relies.  Plaintiff also identifies a pattern of antagonism following his complaints.  He emailed Rozsas concerned that he was being denied work and shut out of meetings because of his complaints.  Likewise, his letters from counsel allege Urban was "freezing" him out of meetings and events due to his complaints.  Moreover,

Rozsas' and Kerneckel's alleged responses to his complaints—that Rozsas "did not have time for [investigating] this" and that if he was so unhappy he should just retire—could also give rise to an inference of animus towards him because of his complaints.

Because "evidence supporting the prima facie case is often helpful in the pretext stage and nothing about the *McDonnell Douglas* formula requires us to ration the evidence between one stage or the other," there is little to add with respect to the pretext analysis. *Farrell*, 206 F. 3d at 286; s*ee also Dillon v. Coles*, 746 F.2d 998, 1003 (3d Cir. 1984) (explaining that the *McDonnell Douglas* framework "does not compartmentalize the evidence so as to limit its use to only one phase of the case. The plaintiff's evidence might serve both to establish a prima facie case and discredit a defendant's explanation."). Suffice it to say, testimony that Plaintiff's complaints about national origin and age discrimination at Urban were met with calls for him to retire, disparaging comments about his age, withholding work, and his exclusion from meetings and events would permit, though not require, a reasonable juror to find that the Defendants' retaliatory animus was the likely reason Plaintiff was terminated. This is not to undermine the compelling evidence Defendants have presented in support of the contention that Plaintiff was terminated for his workplace behavior. Rather, having found that there are two reasonable ways of understanding Plaintiff's termination, it is ultimately for the jury to choose between them.

### 3. Hostile Work Environment Claims

Title VII prohibits harassment that is "sufficiently severe or pervasive to alter the conditions of [the plaintiff's] employment and create an abusive working environment." *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 67 (1986) (internal quotation marks and citations omitted). To prevail on a hostile work environment claim, a plaintiff must establish that: 1) s/he suffered intentional discrimination because of a protected status; 2) the discrimination was severe

or pervasive; 3) the discrimination detrimentally affected the plaintiff; 4) the discrimination

would detrimentally affect a reasonable person in like circumstances; and, 5) the existence

of *respondeat superior* liability.  *Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 167 (3d Cir.

2013); *Power v. Lockheed Martin Corp.*, 419 F. Supp.3d 878, 902 (E.D. Pa. 2020) (identifying

same elements under ADEA).

Defendants argue that Plaintiff's hostile work environment claim fails as a matter of law

because he has no evidence to substantiate his claims, and that (even if true) the alleged

harassment was not sufficiently severe and pervasive to create a hostile work environment.  The

totality of the circumstances are considered in deciding whether harassment was sufficiently

severe or pervasive to create a hostile work environment.  *See Harris v. Forklift Sys., Inc.*, 510

U.S. 17, 23 (1993).  The Supreme Court has directed courts to look to "the frequency of the

discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere

offensive utterance; and whether it unreasonably interferes with an employee's work

performance."  *Faragher v. City of Boca Raton*, 524 U.S. 775, 787-88 (1998) (internal quotation

marks and citation omitted).  By contrast, "simple teasing, offhand comments, and isolated

incidents (unless extremely serious) will not amount to discriminatory changes in the terms and

conditions of employment."  *Id.* at 788 (internal quotation marks and citation omitted).

Plaintiff's allegations that he was regularly subjected to blatantly racist and age-based

taunts and slurs would permit a reasonable juror to conclude that discrimination at Urban was

severe and pervasive such that it would detrimentally affect a reasonable person of his age and

ethnicity, and did so affect the Plaintiff.  His allegations extend beyond simple teasing, offhand

comments, and isolated remarks.  To wit, Plaintiff alleges that Urban employees often called him

"old man," said he was "too old" to travel or understand the hip Urban brand, claimed him he

28

didn't understand American culture and spoke broken English, repeatedly suggested he retire, and called him "Mr. Miyagi," in reference to an elderly, Asian pop culture character.  Plaintiff alleges that he was once targeted with a poster featuring an emoji-like cartoon with stereotypical Asian features captioned "[f]or he a jowwy good fellow . . . happy retirement," referencing both his age and ethnicity.  This incident affected him so deeply that he needed to leave the office to calm down.  He likewise alleges that his supervisors failed to intervene when confronted with these comments, and sometimes laughed at or joined in the harassment.  *See Faragher*, 524 U.S. at 805 ("[C]ourts have consistently held that acts of supervisors have greater power to alter the environment than acts of coemployees generally").  That Plaintiff also apparently made self-deprecating jokes about his age and retirement—for example saying he has "old timer's disease," or should retire because his IQ was shrinking with age—does not defeat his *prima facie* case for a hostile work environment based on the systematic insults and slights regarding his age and Chinese ethnicity that Plaintiff describes.

To the extent Defendants challenge the veracity of Plaintiff's claims about the regular and pervasive harassment he endured in the workplace or its affect upon him, including the claims made in his co-workers' affidavits, such issues must be resolved by a jury.  *See Hayes v. Silvers, Langsam & Weitzman, P.C.*, 441 F. Supp.3d 62, 66-67 (E.D. Pa. 2020) (denying summary judgment on hostile work environment claim because "[t]hough Defendant asserts that [plaintiff] is not credible and that none of her allegations should be believed, 'it is inappropriate for a court to resolve factual disputes and to make credibility determinations' at summary judgment." (quoting *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992))).  Thus, there is a genuine and material factual dispute about the hostile conditions of Plaintiff's workplace such that he is entitled to trial.

### 4. Aiding and Abetting a PHRA and PFPO Violation

Plaintiff also brings claims against Rozsas and Kerneckel for aiding abetting the above-described discrimination against him.  The PHRA makes it unlawful for "any person, employer . . . or employe, to aid, abet, incite, compel or coerce the doing of any act declared by this section to be an unlawful discriminatory practice, or to obstruct or prevent any person from complying with the provisions of this act . . . ."  42 Pa. Cons. Stat. § 955(e); *see also* PFPO § 9-1103(1)(h) (materially identical PFPO provision).  This provision applies only to supervisory employees and only where there is an underlying violation of the PHRA that the supervisor(s) allegedly aided and abetted.  *See Lombard v. Lassip, Inc*., 2017 WL 6367956, at \*5 (E.D. Pa. Dec. 13, 2017).

Defendants only opposition to these claims in its summary judgment brief is that Plaintiff does not have a cognizable predicate offense that Rozsas and Kerneckel could have aided and abetted.  Given the limited argument, because Plaintiff's claims for age discrimination, retaliation, and hostile work environment survive summary judgment, so too do his claims for aiding and abetting the discriminatory conduct.  *See Jeannot v. Philadelphia Hous. Auth*., 356 F. Supp.3d 440, 449 (E.D. Pa. 2018) ("[A] primary [discrimination] violation survives in this case and allows an accompanying claim for aiding and abetting.").  Furthermore, Plaintiff maintains that Rozsas and Kerneckel were aware of the pervasive and derogatory comments about his age and Chinese heritage, failed to take prompt action combatting this harassment, and instead encouraged it through their own comments about his age and national origin.  *See, e.g., Dici v. Comm.*, 91 F.3d 542, 553 (3d Cir. 1996) (denying summary judgment because claim that supervisor "knew or should have known that the Plaintiff" was being harassed, but "refused to take prompt action to end the harassment directed at Plaintiff . . . if proven, would constitute aiding and abetting") (internal quotation marks omitted); *Davis v. Levy, Angstreich, Finney,*

*Baldante, Rubenstein & Coren P.C.*, 20 F.Supp.2d 885, 887 (E.D. Pa. 1998) ("[A]n individual supervisory employee can be held liable under an aiding and abetting [ ] theory pursuant to [the PHRA] for his own direct acts of discrimination or for his failure to take action to prevent further discrimination by an employee under supervision.").

### B. Whistleblower Retaliation Claim

Plaintiff also claims, pursuant to the Sarbanes-Oxley Act, that he was retaliated against for reporting corporate waste, vendor improprieties, kickbacks paid to senior Urban executives, and shareholder fraud. Section 806 of the Sarbanes-Oxley Act prohibits publicly traded companies from retaliating against whistleblowers for providing information to their supervisors "regarding any conduct which the employee reasonably believes constitutes a violation of section 1341 [mail fraud], 1343 [wire fraud], 1344 [bank fraud], or 1348 [securities fraud], any rule or regulation of the Securities and Exchange Commission, or any provision of Federal law relating to fraud against shareholders. . . ." *Wiest v. Lynch (Wiest I)*, 710 F.3d 121, 128-29 (3d Cir. 2013) (quoting 18 U.S.C. § 1514A). To establish a *prima facie* case of retaliation under Section 806, a plaintiff must prove that: (1) he engaged in protected activity; (2) the defendant knew that he engaged in the protected activity; (3) he suffered an adverse action; and, (4) the protected activity was a contributing factor in the adverse action. 29 C.F.R. § 1980.104(e)(2)(i)-(iv). If the plaintiff establishes a *prima facie* case, the burden shifts to the defendant "to demonstrate 'by clear and convincing evidence that [it] would have taken the same action in the absence of [any protected activity].'" *Wiest v. Tyco Elecs. Corp. (Wiest II)*, 812 F.3d 319, 329 (3d Cir. 2016) (quoting 29 C.F.R. § 1980.109(b)).

This case turns on the first element, whether Plaintiff engaged in protected activity under Section 806 of Sarbanes-Oxley. At summary judgment, Plaintiff "must identify evidence in the

record from which a jury could deduce" that he engaged in protected activity under Section 806.
*Id.* "To show that the communication is protected, the employee must have both a subjective and an objective belief that the conduct that is the subject of the communication relates to an existing or prospective violation of one of the federal laws referenced in [Section] 806." *Wiest I*, 710 F.3d at 134. Although a plaintiff is not required to show "a reasonable belief that each element of a listed anti-fraud law is satisfied," he must still "have an objectively reasonable belief of a violation of one of the listed federal laws." *Id.* at 132. In other words, the plaintiff's reports of malfeasance must "relate in an understandable way to . . . mail fraud, bank fraud, securities fraud, violation of an SEC rule or regulation, or violation of a federal law relating to shareholder fraud." *Westawski v. Merck & Co.*, 215 F. Supp.3d 412, 425 (E.D. Pa. 2016), *aff'd sub nom.* 739 F. App'x 150 (3d Cir. 2018).

Plaintiff has not produced sufficient evidence to show the first element of his whistleblower claim. The allegedly protected activities entitled to consideration are Plaintiff's complaints of corporate waste and unlawful or improper activities by third-party vendors and manufacturers raised in the letters submitted to Urban by Plaintiff's attorney between April and September 2018. The gravamen of these letters is that Plaintiff utilized his expertise in sourcing to identify how Urban's vendors and manufacturers were being wasteful, overcharging Urban, self-dealing, and otherwise profiting at Urban's expense, yet Urban routinely ignored his reports of mismanagement and misconduct.[11]

---

[11] Plaintiff also alleges that he reported an illicit kickback scheme involving Urban executives, including Rozsas and Kerneckel, at some point prior to his January 2018 reduction in hours and pay. However, not one of the approximately twenty letters from counsel mentions such a scheme. *See Wiest v. Lynch*, 2011 WL 2923860, at *5 (E.D. Pa. July 21, 2011), *aff'd in part, rev'd in part*, 710 F.3d 121 (3d Cir. 2013) ("In order to determine whether an employee made a protected communication, a court must look to what the employee actually communicated to the employer at the time the alleged SOX violation occurred."). Moreover, because Plaintiff did not file his administrative complaint with OSHA until October 16, 2018, any claims arising before April 21, 2018 are outside the 180 statute of limitations for his Sarbanes-Oxley

First, Plaintiff has not produced evidence from which a jury could conclude he subjectively believed he was reporting violations of the enumerated laws in Section 806. The issue is not whether Plaintiff believed Urban's business practices were wasteful, inefficient, unreasonable, or even unlawful, but whether Plaintiff subjectively believed he was reporting legal violations covered by Section 806. While specific and detailed in the factual allegations therein, none of Plaintiff's letters refer to the Sarbanes-Oxley Act, the enumerated laws in Section 806, or any specific violation of federal law for that matter.[12] While a Sarbanes-Oxley whistleblower "need not ring the bell on each element" of a specified law in Section 806, *Wiest I*, 710 F.3d at 134, more than veiled references to unspecified legal violations is required where, as here, Plaintiff's legal counsel sent over twenty communications to the employer regarding the alleged misconduct and subsequent retaliation. In fact, Plaintiff's repeated references to Urban's Code of Conduct tends to show that Plaintiff believed he was reporting violations of the company's own internal polices, rather than violations of federal law. This conclusion is buttressed by the observation that in his brief in opposition to summary judgment, Plaintiff fails to articulate a single provision of Section 806 arguably implicated by the conduct complained of.

Even if Plaintiff subjectively believed at the time of his reports that Urban violated any enumerated law in Section 806 of the Sarbanes-Oxley Act, he must also adduce evidence that

---

Claim. *See* 18 U.S.C. § 1514A(b)(2)(D). Thus, the employment action at issue is Plaintiff's termination, and the relevant protected activities are his letters to Urban about vendor management and misconduct.

[12] At best, one of Plaintiff's letters from counsel has the subject line "Demand Letter Pursuant to 15 PA. Cons Statute § 1781 (2016) and PA. R.CIV. P. 1506." Not only is this not a federal law or fraud statute, but the contents of the demand letter make no further reference to the state law regarding shareholder derivative suits, its elements, or how Urban's conduct supposedly violated the law. *See Reilly v. GlaxoSmithKline, LLC*, 820 F. App'x 93, 97 (3d Cir. 2020) (finding allegations that employer was required to disclose computer performance issues in its annual SEC reports "fall short of showing that his complaints . . .'relate in an understandable way' to any of section 806's enumerated forms of fraud" because plaintiff "fails to explain how this is fraud").

such a belief was objectively reasonable.  As the Third Circuit has explained, "[a] belief is objectively reasonable when a reasonable person with the same training and experience as the employee would believe that" the conduct reported amounts to a violation of an enumerated provision in Section 806.  *Id.* at 132.  The evidentiary record contains nothing to show that an objectively reasonable person with Plaintiff's decades of training and experience in the fashion industry would believe that Urban's failure to root out misconduct by third-party vendors, and thereby save itself money, amounted to bank fraud, wire fraud, securities fraud, shareholder fraud, and/or SEC violations.  Importantly, the overarching concern in Plaintiff's complaints was that Urban failed to rectify wrongdoing by third parties, namely Urban's vendors and manufacturers.  Generic references to mismanagement, unlawful business practices, lost profits, and losses to shareholders fall short of connecting Urban's own conduct (or inaction) in any understandable way to mail fraud, bank fraud, securities fraud, violation of an SEC rule or regulation, or federal law relating to shareholder fraud.  *See Westawski v. Merck & Co.*, 739 F. App'x 150, 152-53 (3d Cir. 2018) (explaining that a complaint generically alleging bribery, inducement, or a "quid pro quo" "[w]ithout reference to any theory of fraud, and indeed citing no law at all," falls short of relating in an understandable way to a form of fraud covered by Section 806).

This is especially true where, as Plaintiff concedes, his job responsibilities included negotiating prices with vendors, reducing cost, and increasing efficiency in the sourcing of certain styles.  Indeed, the record shows that Plaintiff received positive feedback from Kerneckel and others for driving hard bargains with vendors.  A reasonable employee tasked with curtailing waste and maximizing profits would not reasonably believe that raising concerns related to those goals implicated his employer in criminal fraud.  Plaintiff has therefore failed to identify

34

evidence in the record from which a jury could deduce he engaged in protected activity and, thus, cannot succeed on his Sarbanes-Oxley claim.

### C. WPCL Claim

Next, Plaintiff claims that Defendants wrongfully withheld his earned bonus and accrued paid time off upon his termination.  The WPCL requires employers to pay all "wages or compensation earned" up to the date of separation.  43 Pa. Cons. Stat. § 260.5.  "[A] plaintiff's right to compensation under the WPCL depends upon the language of the employment contract." *Mikhail v. Aeroseal, LLC*, 2016 WL 2346747, at *1 (E.D. Pa. May 4, 2016); *see also Weldon v. Kraft, Inc*., 896 F.2d 793, 801 (3d Cir. 1990) ("The contract between the parties governs in determining whether specific wages are earned.").  Accordingly, to recover such payments pursuant to the WPCL, a plaintiff must show that they were entitled to a bonus or accrued time off at the time of separation under the relevant employment contract.

Here, Plaintiff's offer letter unequivocally states that his bonus was "completely discretionary" and subject to change from year to year.  *See Herbst v. Gen. Acc. Ins. Co*., 1999 WL 820194, at *8 (E.D. Pa. Sept. 30, 1999) (granting summary judgment to employer on WPCL claim where "[p]ayment under the incentive program, and modification or cancellation of the program itself, was solely within the discretion" of the employer).  That Plaintiff had previously been awarded a bonus each year does not imply that Defendants were contractually bound to pay future bonuses, especially in the face such clear contrary language.  *See Giuliani v. Polysciences, Inc.*, 275 F. Supp.3d 564, 578-79 (E.D. Pa. 2017) (dismissing WPCL claim for bonus and paid sick time where there was no express or implied contract providing for payment and nothing indicated that employer's previous "payment of bonuses was anything other than discretionary or that defendant intended to obligate itself to pay bonuses each year").  Moreover, Plaintiff offers

35

no evidence to demonstrate that he was owed paid time off at the time of his termination. Plaintiff therefore fails to raise a genuine dispute of material fact with regards to his WPCL claim.

### D.   Intentional Infliction of Emotional Distress Claim

Lastly, Plaintiff purports that his mistreatment at Urban, and in particular the humiliating way in which he was publicly terminated and removed from the premises by police, amounted to intentional infliction of emotional distress under Pennsylvania common law.  To state a claim for IIED under Pennsylvania law, the conduct complained of must be "[s]o outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."  *Jones v. Nissenbaum, Rudolph & Seidner*, 368 A.2d 770, 773 (Pa. Super. 1976) (internal quotation marks and citation omitted). As the Third Circuit has explained, "it is extremely rare to find conduct in the employment context that will rise to the level of outrageousness necessary to provide a basis for recovery[.]" *Cox v. Keystone Carbon Co*., 861 F.2d 390, 395 (3d Cir. 1988).

Even viewing the evidence in the light most favorable to Plaintiff, the age and national origin discrimination alleged, and Plaintiff's public termination, are not so extreme and outrageous as to meet the high burden of stating an IIED claim.  Because Plaintiff's IIED claim fails, so too does the loss of consortium claim brought by his wife.  *See, e.g., Szydlowski v. City of Philadelphia*, 134 F. Supp.2d 636, 639 (E.D. Pa. 2001) ("[U]nder Pennsylvania law, a spouse's right to recover for loss of consortium derives only from the other spouse's recovery in tort.").

### E. After-Acquired Evidence Doctrine

As a final matter, Defendants claim that they are entitled to limit their damages pursuant

to the after-acquired evidence doctrine because Urban would have terminated Plaintiff for the sexually explicit and objectifying emails he exchanged at work.  The after-acquired evidence doctrine applies in certain circumstances to limit the amount of damages available to a plaintiff, even where a defendant is liable for employment discrimination.  *McKennon v. Nashville Banner Publ'g Co.*, 513 U.S. 352, 359-60 (1995).  This doctrine applies where an employee engaged in misconduct of which the employer was unaware at the time of the adverse employment decision, and the employer can "establish that the wrongdoing was of such severity that the employee in fact would have been terminated on those grounds alone if the employer had known of it at the time of the discharge."  *Id.* at 362-63.  In this situation, reinstatement and front pay become inappropriate and back-pay is typically, though not always, limited to the period of time between the unlawful discharge and the date the new information was discovered.  *Id.*

Defendants claim that Plaintiff would have been terminated for the emails he exchanged with Nguyen and for (apparently mistakenly) using his work email to order pornographic videos. Defendants claim that these emails violate Urban's "Professionalism and Respect" policy, and Kerneckel states in her affidavit that Urban would have "promptly terminated" Plaintiff had it discovered the emails.  Plaintiff, in contrast, argues that Defendants assertion that he would have been terminated for private, albeit distasteful, emails with a consenting co-worker is not credible given the abject failure to address the public and pervasive workplace discrimination against him.

Without delving too deeply into the offensive and degrading emails between Plaintiff and Nguyen, on the record the Court is unable to determine whether or not Urban would have actually terminated Plaintiff upon discovery of the emails.  This is yet another credibility battle between the parties.  For instance, Urban has not explained how or whether the relatively vague

"Professionalism and Respect" policy is enforced, *cf. McKenna v. City of Philadelphia*, 636 F.

Supp.2d 446, 462 (E.D. Pa. 2009) (applying after-acquired evidence doctrine where the

employee's misconduct was explicitly covered by the department's "zero tolerance" policy), nor

provided examples of employees terminated or disciplined for similar conduct. *Cf. Nesselrotte v.*

*Allegheny Energy, Inc.*, 615 F. Supp.2d 397, 406 (W.D. Pa. 2009) (applying the doctrine where

employer provided proof that another employee was immediately terminated for the same

conduct); *see also O'Day v. McDonnell Douglas Helicopter Co.*, 79 F.3d 756, 762 (9th Cir.

1996) ("[G]iven the opportunity to limit the backpay and other remedies . . . an employer has a

strong incentive . . . to conclude that that conduct would in fact have resulted in the plaintiff's

immediate discharge").  Defendants may present this defense at trial.

## IV.   PLAINTIFFS' PARTIAL MOTION FOR SUMMARY JUDGMENT

Plaintiffs move for summary judgment on Defendants' affirmative defense that Ngai

failed to mitigate his damages after being terminated from Urban.

### A.  Facts

Plaintiff alleges that he began looking for work in late September 2018, once he

recovered from the initial shock and devastation of his termination.  Unfortunately, he has found

that executive-level positions like the one he held at Urban are highly competitive and difficult to

obtain.  In his view, this issue is compounded by his age.  Thus far, he has been unable to secure

a similar position in the fashion industry.  Before Plaintiff worked at Urban, he held positions at

other large apparel manufacturers, including Liz Claiborne, Donna Karan, Anne Klein, J. Crew,

JCW Group, Vera Wang, and Betsey Johnson.  Plaintiff was either directly recruited for his

previous positions by the employer, had an industry contact that referred him for the position, or

used an executive recruiting company to locate opportunities.  Since his termination, he has

therefore reached out to industry contacts and engaged multiple executive recruiters with no success.  For example, in October 2018, Plaintiff interviewed for a position with a prior employer, Vera Wang, in New York.  He was not offered the position.  In November 2018, he interviewed for a consulting position with Fuse Production Company in New York, again nothing materialized.  That same month, he applied for a position with Sundance Catalog through a former contact, however, no positions were available.  In early 2019, he applied for a position with David's Bridal.  In March 2019, he interviewed for a Domestic Production position with Bedford/Peninsula Company.  From August through October 2019, he pursued a freelance consulting opportunity with NFP Studio.  Finally, Plaintiff has applied for numerous positions through recruiters and recruitment agencies, as well as sought consulting opportunities though a fashion consultant contact.  He has applied for jobs primarily, though not exclusively, in the Philadelphia, New York, and New Jersey area.

### B.  Standard of Review

Under the ADEA and Title VII, a prevailing plaintiff is entitled to recover back pay damages as well as front pay damages when reinstatement is not available or is otherwise impractical.  *Briggs v. Temple Univ*., 339 F. Supp.3d 466, 507 (E.D. Pa. 2018).  However, a plaintiff has a duty to mitigate damages owed by the employer by "demonstrating a continuing commitment to be a member of the work force and by remaining ready, willing, and available to accept employment."  *Id.* (quoting *Booker v. Taylor Milk Co*., 64 F.3d 860, 864-65 (3rd Cir. 1995).  Whether a plaintiff has met the duty to mitigate damages is a question of fact, and therefore properly reserved for the jury where there is a genuine dispute of material over plaintiff's mitigation efforts.  *See Booker*, 64 F.3d at 864.

Although the plaintiff has the duty to mitigate his losses, mitigation of damages is an

affirmative defense and the burden falls on the defendant to prove a failure to mitigate.  *Id.*  The
parties disagree over the relevant standard for the affirmative defense.  Indeed, there is an open
question regarding the mitigation standard that the Third Circuit has yet to resolve in a
precedential opinion.  The parties agree that traditionally, "an employer must demonstrate that 1)
substantially equivalent work was available, and 2) the Title VII claimant did not exercise
reasonable diligence to obtain the employment."  *Id.*; *Anastasio v. Schering Corp.*, 838 F.2d 701,
708 (3d Cir. 1988) (articulating the same standard for ADEA plaintiffs).  Additionally, in a case
involving the failure to mitigate damages after discharge in violation of the NLRA, the Third
Circuit held that "the employer meets its burden on the mitigation issue by showing that the
employee has withdrawn from the employment market."  *Tubari Ltd., Inc. v. N.L.R.B.*, 959 F.2d
451, 454 (3d Cir. 1992).  In a non-precedential opinion involving an ADEA claim, the Third
Circuit cited approvingly to *Tubari* and articulated defendant's burden as follows: "To prove a
failure to mitigate, [defendant] had to prove either that other substantially equivalent positions
were available to Appellant and she failed to use reasonable diligence in attempting to secure
those positions, or, alternatively, that Appellant withdrew entirely from the employment market."
*Caufield v. Center Area Sch. Dist.*, 133 F. App'x 4, 10-11 (3d Cir. 2005).  Since *Caufield*, courts
within this circuit have likewise found that a defendant may succeed on a mitigation affirmative
defense by showing the plaintiff withdrew entirely from the workforce.  *See, e.g., Briggs*, 339 F.
Supp.3d at 507 ("The employer must establish that the plaintiff was not reasonably diligent in
obtaining substantially equivalent employment *or* that the plaintiff withdrew entirely from the
employment market." (emphasis added)).  This standard is of import here because "[i]n a case
where the plaintiff withdrew from the employment market, the employer need not provide
evidence that substantially equivalent employment actually existed."  *Id.*, *see also DiFlorio v.*

40

*Kleckner*, 2012 WL 748910, at \*12 (E.D. Pa. Mar. 7, 2012) ("District courts sitting in the Third

Circuit have relied on *Tubari* and *Caufield* to acknowledge that an employer need not provide

evidence that substantially equivalent work is available if its former employee has

entirely withdrawn from the job market").

   This court will follow *Caufield* and the numerous decisions from district courts adopting

the view that a defendant may prove a failure to mitigate damages by establishing a plaintiff has

withdrawn entirely from the employment market.  Particularly instructive is *McKenna v. City of*

*Philadelphia*, 2010 WL 2891591, at \*17 (E.D. Pa. July 20, 2010), *aff'd*, 649 F.3d 171 (3d Cir.

2011).  The court in *McKenna* explained that the Third Circuit's holding under the NLRA in

*Tubari* is applicable to employment discrimination cases under Title VII because of the

similarity between the statutes' back pay provisions and how they have been interpreted.  *Id.* at

\*17-18; *see also Holocheck v. Luzerne Cty. Head Start, Inc.*, 2007 WL 954308, at \*15 (M.D. Pa.

Mar. 28, 2007) (applying the withdrawal from the workforce rule from *Tubari* because it "does

not frustrate the purposes of the ADEA or PHRA" and therefore extends to the employment

discrimination context).  Importantly, showing that a plaintiff has withdrawn from the labor

market ought not be conflated with a defendant's alternative burden to prove *both* that there are

substantially equivalent positions available, and that the plaintiff failed to exercise reasonable

diligence in attempting to secure such a position.  The required showing is that plaintiff has

withdrawn *entirely* from the employment market, which is more onerous than establishing a

plaintiff's job search was not reasonably diligent.  A defendant is only exempted from

demonstrating the availability of substantially equivalent work by meeting this heightened

burden.

   **C.  Discussion**

Viewing the evidence in the light most favorable to Defendants, a reasonable jury could conclude that Plaintiff retired after his termination and thereby withdrew from the employment market.  Defendants point to record evidence of Plaintiff's intention to retire by 2019.  While still employed with Urban, Plaintiff expressed his desire to retire by 2019 on multiple occasions.  For example, he referenced or commented about retiring in emails to a travel consultant, to a co-worker joking about winning the lottery and retiring to Naples, to Nguyen about retiring soon because his IQ was shrinking with age, again to Nguyen about his relief to be leaving the retail and manufacturing industry within the next three years, and to his son saying in 2017 that he would be retired "within the next 2 year[s]."  In his 2017 performance evaluation, Plaintiff wrote that it was his wish to train someone to replace him in the coming two years.  The record also reflects that Plaintiff emailed himself and his wife articles and information regarding retirement planning on several occasions beginning in 2015 up to as recently at March 4, 2018.  Plaintiff also communicated his intent to retire to his therapist, who noted twice that he "planned to retire at age 70," which was in 2019, and that he was confident in his ability to "not work after going on SSI."  Notes from his therapy sessions state he was "easing into retirement" on multiple occasions.  Finally, Plaintiff began collecting his full Social Security retirement benefits shortly after his termination.  Defendants therefore maintain that Plaintiff intended to retire by 2019 and did in fact retire after his termination rather than remain in the employment market.

In contrast, Plaintiff claims that he has not retired but rather has diligently sought comparable employment, mainly through his industry contacts, professional networking, and recruiting agencies.  He has produced evidence of search efforts, including emails to industry contacts and recruiters in the fashion industry.  Defendants, in turn, characterize Plaintiff's job search as a lackluster effort to send a handful of emails each year, rather than a formal job search

for comparable employment.  For instance, Plaintiff has failed to produce copies of formal job applications, cover letters, or letters from prospective employers acknowledging that he applied for jobs.  In essence, the parties disagree over the efficacy of Plaintiff's job search approach. Plaintiff claims that professional networking and utilizing recruiters is the best or only way to obtain executive level sourcing positions, which are not typically filled via public postings, whereas Defendants would like to see evidence of formal job applications and follow-through on Plaintiff's inquiries.  Thus, there is a factual dispute over whether Plaintiff's job-seeking efforts qualify him as member of the employment market.  *See Caufield*, 133 F. App'x at 5 (finding there "is a question for the jury" over whether plaintiff who remained on a substitute teacher list, taught for four months at a parochial school, and applied for permanent elementary school teacher openings in the same district as they became available had entirely removed herself from the job market); *DiFlorio*, 2012 WL 748910, at *12 (E.D. Pa. Mar. 7, 2012) (denying summary judgment because "disputed issues of material fact preclude us from determining" whether a plaintiff who made at least some effort to search for employment "withdrew entirely from the workforce").

Because a reasonable juror could conclude that Plaintiff withdrew from the employment market by retiring, Plaintiff is not entitled to summary judgment on the failure to mitigate damages affirmative defense.

## V.   CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment shall be granted in part and denied in part.  Plaintiffs' partial motion for summary judgment shall be denied.  An appropriate order follows.

**March 24, 2021**                          **BY THE COURT:**

                                            **/s/Wendy Beetlestone, J.**

                                            _____
                                            **WENDY BEETLESTONE, J.**